I have been advised that the appellants are splitting their time and Attorney Philip Leavitt is proceeding first and you have 8 minutes for your argument, 2 minutes for rebuttal and the two remaining counsel have each elected 4 minutes of the time allotted and 1 minute for rebuttal. You may proceed, Attorney. Thank you, and I'm sorry, the timer here says 4 minutes, is that... Are you 4 minutes? No, no, it's supposed to be 8 minutes, but the timer... No, I said 8. Yeah. If I... you have 8 minutes, yes. Perfect, thank you so much. May I please record Philip Leavitt for defendants Anucci and O'Gorman. This court should reverse the district court's denial of qualified immunity... Can you adjust the microphone? I'm sorry. Is that better? Yeah. Perfect, thank you. This court should reverse the district court's denial of qualified immunity for my client for either of two independent reasons. First, the complaint does not plausibly allege that they violated substantive due process through their entirely reasonable evidence-based investigation of questions raised about microgenics drug tests, which certainly does not shock the conscience. And second, at a minimum, there was no law clearly establishing that they violated substantive due process by failing to credit incarcerated individuals' unverified complaints and reverse discipline more quickly. So first, plaintiffs haven't alleged that Anucci or O'Gorman engaged in the conscience-shocking misconduct required for a substantive due process claim. At most, plaintiffs allege that they should have acted sooner in crediting incarcerated individuals' assertions of false positives, but it would not be reasonable, much less constitutionally required, for prison officials to respond to unverified assertions from incarcerated people by immediately reversing disciplinary action. Instead, the reasonable response is to take exactly the evidence-based approach that the complaint alleges Anucci and O'Gorman did take, refer the complaints raised for investigation, pursue the matter with the test provider, microgenics, seek independent confirmatory testing when there's reason to believe the test provider's assurances might not be sufficient, and reverse discipline if and when the complaints are reasonably verified. There is nothing unusual, much less conscience-shocking, in taking a few months from a first complaint to complete a system-wide investigation of this scope. Indeed, the timing is particularly reasonable in light of microgenics-reported experts' relentless efforts to mislead the Department of Corrections as to the reliability of microgenics tests, including in repeated hearings... But we don't know any of this. I mean, we don't have any affidavits. We don't know what your clients claim they did. We know from 10,000 feet you say that they knew early on and were taking appropriate steps to investigate. We don't have any facts. We don't have any affidavits. We don't really know. And it seems to me you're brushing through some issues that are troublesome. When did these men find out? This was system-wide. They got flooded with these... So, excuse me. Just let me finish. Then I'll give you time to say whatever you want to say. They got flooded with these notices, and they imposed discipline on people that had real consequences in their lives, which weren't warranted. What's solitary confinement like up in Albion, up in these upstate facilities? It may not shock the conscience, but we don't know what happened. Yes, Your Honor, and that's why what we have to go on at this point is the complaint. And the complaint, we are obligated to give the plaintiffs all reasonable inferences. It may turn out that you win some re-judgment. It may turn out that you win a trial. We don't have your record. We don't know what your people did. Well, the issue here at this stage is that the complaint itself does not plausibly allege conscience-shocking misconduct, and it doesn't allege, certainly, doesn't provide a factual basis to support there being clearly established law showing that the conduct of these defendants, which was to promptly investigate, was... I just didn't hear you. I'm sorry. There certainly isn't clearly established law that anybody has identified that these defendants' response to what happened, which was to promptly begin investigation... That is contradicted by what's before us. I don't think that's really true. Your clients just sit on their hands month after month after month. If you actually parse the allegations themselves closely, I don't think that's really what's alleged. What was alleged is that there was a first complaint raised in January 2019 with Defendant Annucci. That complaint was referred to Annucci's staff to investigate. There was a second complaint by February. There were additional complaints that came in in the following months. Each of those complaints, the complaint itself alleges, were referred to DOCS to investigate. What DOCS did at that point was to go to the test provider, who's supposed to be the expert on this. But they knew from day one that they were supposed to do confirmatory testing. Didn't do it. My client's defendants, Annucci and O'Gorman, absolutely did not know that. There is no allegation in the complaint that my clients knew anything about that. There is no allegation in the complaint that my clients were told that. What's alleged in the complaint is that there was information in the packaging of the test, you know, probably, that said something along those lines. If they read carefully, perhaps. But what's also alleged is that... No, but again, what's also alleged in the complaint is that microgenics, specifically the test provider, who's supposed to be the expert on this, specifically said, don't worry about that. In fact, you don't need to do confirmatory testing. These tests are reliable without that confirmation. And they said that under oath, repeatedly, in hearing. Yes, absolutely. Absolutely, and that's very important to note here. The microgenics defendants were the only defendants in this case initially, and they're the only defendants who should be in the case now. And that's why DOCS is separately suing microgenics in other litigation for breach of contract, for negligence, for negligent misrepresentation. DOCS are also suing microgenics. Absolutely, in this case. You know, these people were in prison. They had clean records, good records, and they were tested by these tests that your client secured and was told and put on notice repeatedly. These tests are not reliable. People are testing false positives for drugs and being disciplined and taking privileges away. I mean, this is pretty horrendous conduct by the Department of Corrections. But my question to you is this. You argue, as you said in response to some questions just now, that the plaintiffs failed to establish that your client's conduct violated clearly established law. But hasn't the Supreme Court acknowledged that there are rare, obvious cases where a body of relevant case law is not necessary? That's the Westview case. Why can't we rely on that case? Why isn't that case, that rare body of law, where you don't need established law? Because the allegations in the complaint don't come close to that sort of situation. What a case like that is talking about is situations where there is active, outrageous conduct by DOCS or by the Department of Corrections, such as a guard, the Taylor v. Riojas case, for example, that the plaintiffs say. What's happening there is that you have prison guards putting prisoners in a cell for weeks on end, freezing cold, with literally raw sewage all over them. It is just light years from what we have here, which is DOCS. So nothing other than that is remediable? No, absolutely not. I mean, absolutely yes or absolutely not. I'm sorry, there certainly are other things that would be remediable, but what we're talking about here, what the legend of the complaint here, is not anywhere close because there is no allegation that the defendants here, my clients at least, Annucci and O'Gorman, knew that these tests were unreliable until after their investigation was complete. Well, but they knew from their own employees, right? Even their own corrections officers were telling them, these people are testing positive that shouldn't be tested positive. So when your own employees are questioning it, and you sit on that information for months on end, yeah, I agree, it's not putting someone in a cell with sewage, it's not like that, but it's pretty egregious conduct. If that was actually what was alleged, perhaps, but it's not. Nobody alleges that Annucci or O'Gorman were sitting on their hands. Again, what's alleged is what I was talking about, that they took action to investigate promptly, immediately upon the first complaint being raised, acted continuously, worked with microgenics, which was actively misleading, including under oath. Wait, don't misstate the record to us. I'm sorry, I don't think anything is misstating what's actually in the complaint if you really parse the allegations. But in any event, to go back to the point about clearly established law, which I think is really important, what the district court did wrong here is ignored the principle or failed to recognize the principle that you need clearly established law that is specific to the fact here. At a bare minimum, there is no clearly established law saying the speed at which the department responded to these allegations here was unconstitutionally conscience-shocking. Is it possible that they could have potentially moved more quickly with the investigation? Sure, in hindsight, anything is possible. What solitary confinement line could Al be on? I'm not aware of what the special housing unit is specifically there. I think they're usually similar across facilities. I certainly think it's not something you would want to be in, and it's not something you'd want to be in if it's based on a false positive. That's why this was investigated, and that's why docs looked into these issues and went to the test provider and went back to them again and again and then did their own independent confirmatory testing, even when Microgenics was saying, you don't need to. These tests are reliable. They're just more sensitive than the prior tests, so it makes sense that there are more positive results than before. Basically, my clients had to work through being actively misled by Microgenics at every step of the way. They told us they had the instructions on the packages. Which Microgenics is specifically testifying under oath, we should ignore because it's not actually necessary to do that confirmatory testing. Again, let me reiterate that my client, there's absolutely no allegation in the complaint that a Nuccio or a Gorman had that information that this was on the test instructions. Okay, thank you. Thank you, Your Honor. Thank you, counsel, and you have reserved your two minutes for rebuttal. Thank you. We'll hear from, is it Attorney Queza? Yes, Your Honor. Thank you, Attorney Queza. You have four minutes, and you saved one for rebuttal. Thank you, Your Honor. May it please the court, my name is Thomas Queza. I represent Richard Finnegan. As a baseline, the allegations in the complaint state that the DOCS defendants were not the subject matter experts as it related to testing. As a baseline, the allegations in the complaint state that the Microgenics defendants were the subject matter experts and took affirmative steps to mislead DOCS defendants. That's in the complaint. For example, when DOCS defendants actually raised concerns about Attica, Microgenics defendants came in, did an assessment of Attica, said everything was fine in Attica and there was no problem, everybody was doing what they should be doing. So the DOCS defendants are making efforts to try and get information given this information disparity. They're not the subject matter experts, Microgenics are. When they go to Microgenics, they're not getting straight answers. In this context, Richard Finnegan is alleged to have made two points. One is he failed to pass on information to O'Gorman. Number two, he saw no reason to reverse disciplinary actions. In this context, this court recognizes that in these cases, there is the dilemma of conflicting obligations. Richard Finnegan is functioning in an environment where he has conflicting obligations. The obligation to keep prisons free from illicit drugs, to keep incarcerated individuals healthy, and the obligation to ensure that testing is accurate. He made those decisions in the context of those conflicting obligations, and this court gives a lot of deference and a lot of latitude when public officials are making decisions in that environment. In fact, this court has held that even when they make poor decisions, it doesn't shock the conscience. But didn't your client in August of 2019 advocate against reversing discipline or releasing people confined based on these results, test results? Yes, he did. Test results that were known to be unreliable at that point. By August 2019. So, you know, at that point, he certainly had reason to know that you couldn't rely on these tests and would not reverse the discipline or allow people to be released. I mean, one of the named plaintiffs was due to be released and couldn't be released because of it. Yes, Your Honor. But in August, for the first time, Microgenics revealed that the, you know, for incarcerated individuals. Acting Commissioner Annucci, on September 4th, 2019, had a telephone call, not with the salespeople, but with the technical experts at Microgenics, and they advised him at that time, for the first time, that the tests may be too sensitive for incarcerated individuals in a facility. He immediately took steps then to reverse it after that call. All of this... Your people knew six months before that there was a major problem with these tests because they were flooded with complaints and they all said the same thing. Yes, Your Honor. But what they were doing at that point was working through it, and Mr. Finnegan is balancing that concern with the concern about, you know, the obligation about keeping illicit drugs out of the prison. Respectfully, Your Honor, they weren't sitting on their hands. The tests were coming back in question, but there needed to be analysis to be done.  And for Mr. Finnegan, he was working through that problem when he had the obligation to ensure that incarcerated individuals were kept safe and free from illicit drugs while balancing the needs for accurate test results. Let me ask you this before you sit down. How many months do you think someone would have to spend in solitary confinement in Albion or Attica before it shocked one's conscience? Your Honor... Without any justification at all. I'm sure it shocks their conscience, you know, from day one. When someone is accused of something they didn't do, they know they didn't do it. Not necessarily the prisons, but our conscience, mine. In this regard, the court has defined certain procedural boundaries for procedural due process. The issue here is that what the court below defined as functionally arbitrary. That's not a clearly established law that's beyond debate that Richard Finnegan could look to and be guided by. They're functioning, Your Honor... The plaintiffs are sympathetic. There's no question that what happened to them was wrong. But you have an institution that is trying to work through this, balancing the public safety need and the incarcerated individual need to keep them safe, to keep them healthy, to keep drugs out of the prison while they work through this. And at that time, Microgenics is taking affirmative steps to mislead them, testifying at hearings that there's no problem, even when they raise concerns about Attica and maybe another facility. They come in, they do the analysis, and they say everything is good. And in essence, the test may be more sensitive than the test you had before. So throughout this, we don't dispute the hardship on the incarcerated individuals. Did you dispute that from day one that your clients knew that they should be doing two-step testing? They... That may have been in a package insert, Your Honor. But the... Instructions. But the... Instructions for the test. That was coming from Microgenics. Rather than putting it on the internet. No, but from Microgenics, and, you know, they're alleging the complaint to be the subject matter experts. You didn't need confirmatory testing. And the complaint alleges that the doxing defendants were not the subject matter experts. So they're relying on the Microgenics defendants for information. And when they raise these concerns, Microgenics comes in, does an analysis in Attica, and even then, they persisted in their questions. They're in an information disadvantage, Your Honor, and they're trying to work through the competing interests of keeping incarcerated individuals safe and healthy, but in the same token, get to a reasonable endpoint with regard to testing. Thank you, sir. Thank you. Thank you, counsel. You've reserved one minute for rebuttal. Thank you. Thank you, attorney. Is it Nance? Yes. Did I pronounce that correctly? Thank you, sir. Yes, Your Honor. You have four minutes, and you've reserved one for rebuttal. Thank you. May it please the Court. My name is Jeffrey Nance. I represent the appellant, Charles Kelly, in this matter. I would join in the legal arguments made by my co-appellant, counsel here in this case, and refer and rely upon the arguments made in the brief. However, I think the facts are particularly important in this case because it's a qualified immunity issue based on a motion to dismiss prior to discovery in this action. However, I respectfully submit that the corporal erred in failing to consider the factual allegations and the complaints specifically, as they're made with respect to the history of Dock's drug-testing practices. Prior authority and precedent in the Peranzo case, which upheld Dock's practice of using two preliminary tests to confirm a positive drug-test result. So it wasn't the problem here. It wasn't that they didn't do a confirmatory test. It's that the confirmatory test they chose was the same exact test as the initial test. And typically, a confirmatory test uses a different technique, and that's why they call it a confirmatory test, to confirm that the technique of these defective mycogenics tests were completely unreliable. And in the past, didn't the Department of Corrections use a different test, a more sophisticated and different methodology? And I won't attempt to give the technical medical name for the test, but it's a different test, which would, in effect, really verify. And what they did was they just repeated the same test and got, not surprisingly, the same false positive. Your Honor, I think everybody's more well aware of the inherent problems with using preliminary test results and conducting the test twice on the same sample and using the second test as the confirmatory test. However, the Dock's defendants in this case, in Dock's, believed that the second test was the confirmatory test. Kelly, as alleged in the complaint, had no scientific knowledge, training, or education. And I would submit that's probably the same is true for all the Dock's defendants. I would just say, at the time, it was the Emmett test that was done in Paranso, and the court found that the test was sufficiently reliable that if they did two tests on the same sample, that that was sufficient. In this case, Microgenics had different scientific basis and technology behind their tests. They were aware that Dock's was continuing its practice of conducting two tests on the same sample and treating the second test on the same sample as a confirmatory test. They were not aware that it needed to be sent to an outside lab for confirmatory testing using GC or LC-MS testing to confirm the preliminary test results. That wasn't discovered until several months into the investigation. Microgenics specifically withheld that information. They contracted with Dock's to continue the testing to provide them a better test, a more sensitive and a more reliable test. My client was not aware that the test, even upon his receipt of outside confirmatory testing in August, which he reported to O'Gorman and Annucci of the test results, and in ten days they stopped testing for buprenorphine. But there was nothing in those six samples that were tested, five of which were false positives, which would give him an indication that the entire test was unreliable. But there was powerful circumstantial evidence that something was going on. They started getting these reports first through the year. They were flooded with them. There were tests that they hadn't... There were positives, false positives, on a level that they had not gotten before. There were false positives with respect to people who had clean and exemplary disciplinary records. These things kept flooding in. They kept using the tests. So you don't have to be a biochemist to know, to have a good sense, that new regime, flood of tests, positive results, under circumstances clearly suggesting something is going on here, something that's suspicious. Again, Your Honor, I would respectfully submit that complaints from incarcerated individuals that they have not taken drugs and that the test results are inaccurate and unreliable is nothing new. So if we... All over the system, except the coming in to doctors. And docs, including Kelly, had microgenics, the contractor, with the expertise, which historically, that's how it worked. They went to the facilities. They verified that the tests were operating properly, the operators were operating them properly, and the tests were reliable and could be relied upon in the disciplinary proceedings. And they continued to send. Part of the contract was, they sent representatives to these hearings. And they testified at these hearings. And when questioned, they testified. They're accurate. They're reliable. And you may prevail. But this is... That's all powerful, powerful information for some re-judgment. But these are the allegations in the complaint. And they can't be ignored. And I submit respectfully that the district court ignored all those allegations. You can't, on one hand, sue the microgenics defendants and haul them in with all these allegations and a failure to train, a failure to disclose, misleading the department, and then, on the other hand, blame the department officials who have no knowledge and expertise and are relying on them to decipher what all of this means. And eventually, they did. That's why you have to scope all that out. They're certainly entitled to plead as the alternative in consisting hearings. The federal rules clearly contemplate that. I'm sorry, Your Honor. I was distracted for a moment. Do you have a question? I apologize. No. Full statement. I want to answer you. I really do. I have a question. You have, on the defendant's side, the appellants. How many of you are there? Four? Yes. Obviously, there's been a decision at some point that separate counsel are suitable or appropriate. In these cases, often... I'm thinking of one law firm representing all of the DOC's defendants. I take it that it's conceivable, in theory, under the current posture in the case, that one, two, or three appellants might prevail on the basis of qualified immunity, but that another one would not. Is that possible? Or do all of the defendants rise or fall together? Your Honor, that's a good question. If it were my decision, I believe all of the DOC's defendants are entitled to qualified immunity based upon the facts alleged in the complaint. You're here to represent Mr. Kelly. Yes. So, let us assume for the argument, though, that you prevail here. Is it possible that you could prevail while the others did not? Is that a possibility? I would respectfully submit that that's up to the court. It is possible because, ultimately, I haven't focused, perhaps, necessarily in detail on the other DOC's defendants, all of the facts and everything, but it is possible, yes. I'll just, yes, it is possible. So, your concern really is with Kelly, and you're trying to get Kelly out in this, and you may prevail on that, depending on how we review the pleadings, right? Yes, that's who I represent. And it's possible that others do not prevail. Yes, Your Honor. Thank you. I have one question. Your argument, you're saying, well, you know, we're not experts, we're not experts in biology, and we relied on microgenics, but an average person who tries either a product or goes to an expert for a service, and all of a sudden, that service is not working out. You know, the problem here is DOC's had a contract with a company providing a valid test, and it had used it for years. And all of a sudden, they switched their contract to this new company, and all of a sudden, all these model prisoners who had tested negative for years and years and years, all of a sudden are testing positive. It appears, based on the allegations, that the news or information is rampant within the prison system, including guards, your own client's subordinates or employees, saying something's amiss here. A normal client, customer, would say, I'm not sure we can rely on microgenics. You know, do we have some of those old tests we were using? Let's try that. But why aren't they entitled to make that determination? Is the only defense, we're not chemists, and therefore, we can bury our head in the sand and rely on microgenics, or would a normal customer have questioned that? I think DOC did question that, Your Honor, and I think that they pursued an investigation into what the potential problems were, and they started with the vendor, and microgenics came and assured them and continued to testify everything was fine. As complaints continued to mount and the concerns were not addressed, they continued, they took further steps until they reached a determination that the tests were no longer reliable. If it was clear that the tests were unreliable and could not be used, DOC's wouldn't use them, but it wasn't the decision for Charles Kelly to do that. He was an associate commissioner, an executive assistant to Annucci, who assembled task force and groups, and he reported to them, and that's where the determination ultimately for this very large state agency, statewide, to make that determination. So while one individual or a few might have felt, and some of the officers firsthand looking at this, something is amiss, something is wrong here, as they communicated those concerns and complaints, the department looked into it, but it was never black and white. We can look at it in hindsight and say, oh, well, read the package insert. It says confirmatory testing, but I would submit that if you said to any DOC's officials, confirmatory testing, back at that time, they would have said, oh, the second test, that's confirmatory testing, because that's the way it was always done. But you would agree that we don't know what Mr. Kelly knew and Whitney knew. We don't have a deposition from him, we don't have an affidavit from him. No, we don't, but what we have are the allegations and the complaint, which simply state that he was given some complaints in April. The individual with the programmatic oversight over drug testing was Deputy Commissioner O'Gorman. When Kelly found that information, he reported it to O'Gorman and Annucci within their areas of authority. So in April, he has some complaints, and then in June, he gets some. We don't know what Annucci knew when, what he told, what he said to anybody else, whether he was completely relying on genetics, or whether, whatever. We just don't, we simply don't know that. The clearest allegation... He may be entitled to qualified immunity, but we need some basis, factual basis, for giving him qualified immunity. The closest allegation, factual allegation, the complaint that comes to what he knew and when he knew it, that's particularized, it's not just generalization and pure speculation, is the test results in August of 2019 at Eastern Correctional Facility when five of the six come back as negative tests on confirmatory testing by an outside lab. And he takes those results, it's alleged, he informs O'Gorman, and he informs Annucci, and we know based upon the allegations that within 10 days... How do you know he informed? Excuse me? How do you know he informed? How do you know what he told? It's an allegation in the complaint. The complaint makes this allegation, and that's what I'm respectfully submitting is that they own those allegations. They can't just pick and choose some of them. If you look at those allegations, you can't on one hand say, well, what did you know and when did you know? Well, you got the test results in August, and it was five out of six, and you then informed O'Gorman and Annucci, and then within 10 days, O'Gorman ordered that buprenorphine testing be stopped across docs, and that was with the approval of Annucci. Those are the allegations. So we have to, the court must rely on those allegations. They can't be ignored. Thank you. We have one minute for rebuttal. Attorney Rickman? Did I pronounce that correctly? Brinkerhoff. Thank you, sir. You may proceed. Each side's got 20 minutes to make it even. You may begin. I appreciate that change. Good afternoon. May it please the court. My name is Matthew Brinkerhoff. I represent the plaintiffs in this action, this appeal who had the misfortune of being selected in the punishment lottery that was instituted, imposed, and not corrected for almost an entire year by the individual defendants or the appellants in this case. We have four of them here. There's another that did not assert qualified immunity, is not part of this appeal. And there were three that the district judge, in parsing the complaint, determined there were not sufficient allegations to hold them personally liable for the conduct. I want to just focus on that for one minute, going back to Judge Cabranes' question. It's worth just looking more broadly at this for a minute. We have our individual defendants. Yes, of course, the corporate defendants are in this case as well. And yes, we have pled a number of theories, many of them in the alternative. But it's also true that these individual defendants were aware of, and one of them who has one of the non-appealing ones were the ones who selected this new system of drug testing, knew that it was a different technology than had been previously used, where they would do two of the same tests and call the second confirmatory, and knew from the package insert that we talked about a little bit before that it was clear and unequivocally stated in the written instructions for consumers, not for biochemists, for consumers, that these were preliminary tests, that in order to get a confirmed analytical result, you had to do confirmatory testing of a specific sort. The same specific sort of confirmatory testing that docs and all the officials did when it came to anyone who was on parole. Throughout this whole period, and to this day, if you are on parole and you get a preliminary screening test of the sort that were being used in the prison in 2019, it has been sent out to an independent lab, subject to confirmatory testing, and no punitive action is taken until that confirmation occurs. And in fact, what we know here is that eventually, in August of 2019, a full eight months into these waves of complaints and reports, which indeed did include, if you read the complaint, all the allegations are there. And obviously, we are entitled to the inferences and all of the rest at this stage. But that was the first time that they used their own confirmatory testing system that they used with parole and sent out six samples to be tested. You know, I understand the allegations,  But what I struggle with in terms of the complaint, if you can assist me on this, is what specific liberty interest do you allege your client and the others were deprived of? And what case identifies that interest as cognizant? Because under the precedent that we're bound to follow, it doesn't seem that you've alleged a liberty interest that would be recognizable under law. So can you help me with that? What liberty interest? And I couldn't detect one from the district court opinion itself. Yeah. And this is the sort of fundamental core argument that plays out in the brief that we haven't really talked about yet today. And that is, because we're dealing with prisoners who have many constraints on their normal freedom and liberty that we all, as free people, enjoy. Which is different than parole or somebody on pretrial services that's not held. This is all true. But generally speaking, any infringement of liberty is part of the liberty that is protected by the due process clause of the 14th Amendment, or the Fifth Amendment in some of the cases. Same clause, same language. How do you go for the case that say, even 101 days of solitary confinement is not enough? Right. In that case, very important case, Supreme Court Sandin versus Conner. In that case, if you read it carefully, it is clearly and unequivocally a procedural due process case. Except it does also apply to substantive rights. When I read it, I don't see that there's a distinction there. It's both. Well, I would cite to you just, I'm Read from Sandin, yes. Sandin says unequivocally on page 487 in its holding, it says, we hold, therefore, that neither the, this is a Hawaiian prison, prison regulation in question, nor the due process clause itself afforded Conner, that was the plaintiff, a protected liberty interest, and this is the important part, that would entitle him to the procedural protection set forth in Wolfe. Wolfe was the case from 10 years earlier that set the federal courts down a road of trying to determine various indicators of state-created liberty interest that would be protected procedurally by the due process clause. It says nothing about substantive due process. What it's doing is practical and pragmatic. The 5-4 majority in that case were concerned, understandably, that if all of the liberty interests that we enjoy as free people were recognized in the prison context, then every diminution of one's liberty, which would certainly include being put into punitive segregation, because that's a more confined version or form of having your liberty constraint. Just to answer Judge Parker's question from earlier, all punitive segregation in the state prisons mean that you are in your cell for 13 hours a day, every single day. You have only limited time to be out for a shower every few days. It's uniform and much more restrictive. There's no question about that. Setting aside the kinds of things that occur with one of our clients is I think you recognized Judge Kahn, where it actually delayed his release from parole, which obviously is pure freedom. But what was Sandin recognized at that time was you can't be giving people a full due process hearing every time there's a slight change in their prison conditions. And even though it might be something you'd be entitled to if the government were to impose those kinds of conditions when you're outside of prison, it doesn't work. And you are already in prison and obviously your liberty is constrained. So there are some minor changes. Even as much as being put into punitive segregation, that doesn't give rise to the right of an actual full on due process hearing. Now ironically, the New York state court system has chosen to give people those hearings, even though Sandin makes it clear that they're not constitutionally required. But nothing in Sandin says, and in fact, there's a footnote in Sandin, footnote 11, that makes it clear that Sandin was not intended to in any way diminish any of the other constitutional guarantees and rights that are still enjoyed by people who are in prison. It makes express reference to things like the Eighth Amendment. And we have made an alternative argument for affirmance here that the district judge got it wrong when he analyzed that. Footnote 11, as I look at it, is talking about being free from arbitrary state action, meaning you can't arbitrarily punish someone. But the cases you rely on for arbitrary government punishment also don't involve prisons. They don't involve situations where somebody is punished within prison. Because within the prison system, to administer the prison system, there's some loss of rights even within that system. None of the cases you cited relate to prison situations. Do you have one? I mean, you cited Chapman, Sutherland, Fauci. Do you have a case where there was arbitrary government or state action involving prison discipline? I mean, we do cite some cases that are more individualized. And we cite them in the Eighth Amendment context as well. A lot of times, both of these kinds of claims are brought in tandem. The district court rejected the Eighth Amendment. I'm asking if you have a case that actually deals with prison conditions. Well, what I was going to say is in some of those cases, it's an individual decision that's arbitrary or clearly punitive that gives rise to either a substantive due process claim or an Eighth Amendment claim. But not in the prison context. Well, no. Even in the prison context. Even in the prison context. Which one? I'm going to have to look for it. It's a case. It's an Eighth Amendment. Just to be clear, I'm talking about an Eighth Amendment case. OK. And basically what happened was, and we say in our brief, just as an example, which I think we could all agree on. In prison, the prison officials clearly can subject people to strict searches. We all know that. There's no Eighth Amendment or substantive due process violation there. But if the prison system were to institute a system that said, any time we conduct a strict search, we're going to do it 10 times in a row. It doesn't serve any purpose. Whatever we're going to find, we find the first time around. But we just want to impose ourselves and assert our authority and our power and our domination and punish every prisoner by doing it nine times more. Everyone would agree, I think, or I'd like to think, that that would violate substantive due process and or the Eighth Amendment because it serves no purpose whatsoever. It's arbitrary. Here, if you fairly read the complaint, we get taken to task in the reply that they didn't actually institute a punishment lottery. But if you read that complaint, it's clear that that is what we are alleging. It is so random and so clear right from the get-go. If you read that package insert, the minute they start getting this wave of complaints, they should have immediately, if they hadn't before, looked at the package insert that says, confirmatory testing. You're not claiming that they randomly picked people to test because one of the named plaintiffs had been for years subjected to the test. She had privileged housing, including conjugal visits and visits with her husband and child. And she was required to be tested in order to continue in that housing and maintain that privilege. So you're not suggesting that she was picked out of some lottery system to test. You're saying, well, what I'm hearing you be saying is that the use of an unreliable test amounts to a lottery system. Is that what you're trying to tell me? That's absolutely correct. I'm sorry if I wasn't clear, but that's exactly what we're saying. And I think it's an apt analogy, given that 83% of the time, based on the confirmatory testing they did, you're going to get a false positive and just punish someone without any justification. I'm sorry, Judge Barker. No, I can see the argument that your clients were subject to the treatment that could have been avoided. But what's the substantive due process like? In other words, what happened in this case that we would be compelled to say is so egregious, so outrageous, that it shocks contemporary conscience? It's similar to the strict search analogy that I was making a moment ago. When a system is instituted that is the equivalent, and I think it's a true and fair reading, of just pulling a name out of the hat and just sending somebody into punitive segregation because there's- Well, that's not entirely true. I mean, those prison officials gave tests and came back with negative results, positive results, excuse me, and assumed they were liable and did what they normally do when they get similar test results. What shocks the conscience? Because in this case, what's the outrageous and egregious constant shocking thing? It's that they knew or should have known or at least deliberately indifferent to the fact that these test results were so manifestly unreliable, should have understood it before the test regime was even instituted, should have certainly understood it once the wave of complaints started that they needed to subject this to confirmatory testing. Had they done so, they would have found out, which they eventually did in August, that five out of six, and extrapolate that to the hundreds of people this happened to, of those preliminary test results were unreliable and insufficient to do what they did. And remember, as soon as you get one of those test results, you are immediately placed in punitive segregation. All of your previous privileges are denied you. Any of your right to visit with your family and things of the sort that happened to our clients, those are taken away immediately. That's before there's any hearing or anything else. Sorry. So, but why isn't this simply a case where we had government actors who were not as careful or conscientious as they should be, and the consequence was either going to solitary confinement, going to keep lock, or staying there longer than the inmates should have. What's, I mean, it's hard to, I'm not defending it, but, I mean, why is that, in a prison context, so outrageous and contrived? Because it's not negligent. It's not happenstance. It's not a simple mistake, an honest mistake. It's none of those kinds of things which would give rise to a defense unquestionably. What we've known forever is that the due process clause protects everyone, including prisoners, as I believe yourself and Judge Cabranes even said in a case from 2013 called United States versus McClurin. Prisoners still have the right to be protected from a substance of due process violation. And what that has to include is prison officials who are deliberately indifferent in a way that amounts to just random punishment that is untethered to any activity or justification. But it's not random. It's not random. It's a mistake. Well, it's random in the sense that if only one out of every six tests is going to be accurate, it means that five out of six times, you select somebody to punish without any justification whatsoever. And you know that, because the tests themselves say you have to do conformity test and you're not doing it. All of the prison guards are telling you there's some big problem, because we have people who are testing positive and there's no indication that they ought to. And instead of acting on that immediately, like, listen, first I applaud them for eventually acting and doing the right thing. So that's a good thing. But I don't think anyone can say with a straight face that they did that with any kind of the appropriate alacrity that was required under the circumstances. And honestly, when you institute a new system of this sort and it directly contravenes the, you know, it's in our brief, but we talk about the package info. I have one here. I could even have that up. The part in yellow in my hand is at the very top. And it's the very first part that basically explains that you have to do confirmatory testing. Even if they didn't realize that when they instituted it, the first part of any investigation into what was happening would have shown them this. And they had the ability to do the confirmatory testing? Their claim was, and I asked some questions about this, that when Microgenics said we did a confirmatory test, they assumed it was the correct confirmatory test. I'm sorry. Can you say that again? I understood your opponents to be arguing that they did, that they understood that Microgenics' confirmatory test was a proper confirmatory test. And that they're not chemists to know that it wasn't the proper confirmatory test. How do you respond to that? If they said that, it's not really worthy of any kind of credence. What I'm quoting you, and it's very clear and unequivocal. It says, the assay provides only a preliminary analytical result. A more specific alternative chemical method must be used, to obtain the confirmed analytical result. And that means, and then it goes on, gas chromatography and spectrometry, excuse me, is the preferred confirmatory method. They knew that subjecting that same sample to the exact same test did not comply with that bolded instruction at the very top of the package insert. That's why they knew that they should have, in January, as opposed to August, immediately suspended all ongoing discipline and started to do confirmatory testing. And of course, a year later, that's what they did. They got rid of Microgenics. Right now, the system within DOCS for years now, they do preliminary testing. They send it out for confirmatory testing by labs. And if it comes back positive and is confirmed, then they file charges against the person who's incarcerated who's involved. That's how it works. The last thing I'll just say about the individual defendants, we will find out, we've completed a lot of discovery already, and through summary judgment or trial, we will find out who's culpable and to what degree. And there may be some people who end up being found not culpable. But at the end of the day, just rest assured that Microgenics has an indemnification agreement with the state. Microgenics will have to pay any judgment that is found against any of these individual defendants will be both indemnified by the state. And beyond that, the state will be indemnified by Microgenics. So none of the individual defendants before you are in any way going to have their personal finances affected in any way by this. And to the extent that they were culpable and responsible, they should be found liable. Judge Cabranes has a question. I don't want to take up your time, but I do want to confirm. Your clients are also suing Microgenics directly? Absolutely. In fact, the first defendant we sued was Microgenics. It was only when the state IG did an investigation that made it clear that there were individuals who were culpable under 1983 and the Substance Abuse Process Clause and Faith Amendment. I'm sorry, Judge Cabranes. You're basically claiming a kind of negligence on the part of the defendant, the individual defendants, right? I don't think that's correct, no. You're suggesting a purposeful, conscious infliction of harm. I am suggesting a purposeful, deliberate indifference and disregard for obvious information that should have led them to stop and or prevent this lottery from occurring and punishing people with no justification. Do you have a theory as to why they would do that? Maybe it's not relevant. I'm happy to share my theories. Within the prison system, as you heard actually from one of my adversaries, there is a – it is not uncommon for people who are incarcerated to be thought of as less than fully human, to not be regarded the same kinds of respect and dignity as other human beings. And when they complain, I think it's endemic within the system to ignore those complaints and not take them seriously. Again, I give them credit. Eventually they did take it seriously enough that they corrected this, as they should have. But in a different kind of system that really gave the kind of respect and dignity that I think everyone is due, including somebody who is serving a sentence for a crime, they would have behaved in a way that wasn't indifferent to those things. And you're familiar with two major cases here, Wiley against Kirkpatrick in 2015, and before that, Freeman against Reinhart. I'm sorry, are you going to consult with – I just didn't hear you, by the way, with these cases. I apologize, Judge Kourbanas. I'm not off the top of my head, am I familiar with them? What I'm getting at is this. It strikes me that your argument, if we were to affirm the district court in this case, we would be required to reverse two different opinions of this court. I can give you the citation, Wiley against Kirkpatrick, 801 F. 3rd 51, 2nd Circuit, 2015, quoting Freeman against Reinhart, 808 F. 2nd 949, 2nd Circuit, 1986. And I very much want to try to respond to your question. Is it possible for you to tell me what about those two opinions you believe are in conflict with affirming the district court? Well, I think the whole – I'll read you the holding. A prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct, which may result in the deprivation of a protected liberty interest, unquote. Now, we're not – we take this law very seriously, but we're – our business here, so don't feel under an obligation to answer now. Just send us a letter. That will be fine. A letter briefed, two or three pages, in which you address those two cases. And to put it another way, at least four courts of appeals have now applied Sandin to substantive due process claims, which is what you think and we think you're doing here, right? You would agree with that? No question. We are asserting solely a substantive due process claim. We do have this alternative Eighth Amendment claim, but yes. Okay. So the question is whether we're creating – whether we are in the process of creating a circuit split, perhaps, if we adhere to the law of this circuit. But you – no reason to comment on it now. You'll have an opportunity to send us a letter. I appreciate that and I assure you we will – I will take you up on that offer and we will submit just a brief response about those specific two cases. I can tell you that when it comes to the other circuit courts, some of which are cited in the brief for Mr. Annucci and Mr. Gorman by the Attorney General, and we can address that as well in this letter if you would like, there are – I don't think it will create a circuit split of the sort that one might be concerned about. All these cases are very fact-specific. In the end, almost all of them, if you look at them carefully, are really about the right to a process, to having a hearing, to calling a witness. In some cases, the real overlap, which I think might be the two cases you're talking about, is when there's an allegation made that there was no evidentiary basis whatsoever for filing the charge against the inmate and therefore it's completely made up and false. And I appreciate that there could be a concern that if suddenly every time you claim that, it gives rise to a 1983 substance of due process claim, there might be issues there. But my first answer that I just want to provide is this is not an individual accusation against one specific inmate. This is an accusation against an entire system that disregarded thousands of inmates' complaints and in a way that was clear and obvious and problematic. And I believe those facts make that very distinct from a random person who's incarcerated lodging a complaint that somebody punitively decided to charge them unjustifiably. But we will respond in more detail and more specifically, and thank you for that opportunity. And before you sit down, I just wanted to be sure I understand you in one point. Your substance of due process argument is predicated on the process, the flawed, as you say, process that led to this punitive discipline, as opposed to what the discipline itself consisted of. That's correct. That's correct. If you accept my belief that we have plausibly alleged that this was the material and functional equivalent of randomly selecting people for punishment, even if that punishment might be of a variety that in many circumstances would not be protected by the procedural guarantees of the due process clause, the fact that you are doing so in a random way with no sense of whether or not there's any justification, in fact, knowing there is none, violates the substantive component of the due process. And you're not arguing that subjecting someone to lockdown 23 hours a day with no amenities and no visits and no phone calls and so forth, that's not the substantive due process violation that you're pressing. What you said is absolutely correct. That is not what we are pressing. It's the procedure, the flawed procedure that resulted in the loss of privileges for the keep of... I think that that's an accurate way of putting it, of punitive segregation. Some of it's keep lock, some of it's... I think that's all correct. It's just using the word procedure in that sentence makes me uncomfortable because I don't want to be in any way saying that this is a procedural violation. Thank you. Thank you. Thank you, counsel. Attorney Levitz, you reserved two minutes and your co-counsel each reserved one minute. Thank you. I just want to make a couple points quickly. The first is that your honors are exactly right, that plaintiffs did not allege infringement of a constitutionally protected liberty interest, which is an independent requirement for a substantive due process claim. The discipline plaintiffs allege that they received simply did not impose the kind of atypical and significant hardship in relation to the ordinary instance of prison life that's required to state a due process claim under Sandin. And the district court was simply wrong to conclude that Sandin applies only to procedural due process claims, as your honors were noting. Every four different courts of appeals in published opinions and another... I'm sorry, five in published opinions and another in an unpublished opinion all have held that Sandin applies beyond procedural due process to substantive due process as well. Secondly, I wanted to be very... You said the other circuits. I know the Sixth Circuit has indicated that Sandin did not, but our circuit has not. Our circuit has not directly addressed that, but the Sixth Circuit, the Third Circuit, the Ninth Circuit, the Fourth Circuit, the Seventh Circuit have all addressed it in published opinions that we cite and the Eleventh Circuit in an unpublished opinion that we cite as well. So moving on to the second point I wanted to make, I just want to be totally clear. The complaint simply does not allege that the department randomly imposed punishment on incarcerated people through a punishment lottery. That is just light years away from what's actually alleged in the complaint. The defendants didn't impose discipline at random. They imposed discipline after hearings based on positive drug test results, which posed a serious safety threat in prison. And insofar as those tests were subsequently determined to be insufficiently reliable, the department reversed the discipline. That conduct is entirely reasonable and certainly doesn't shock the conscience under clearly established law. On the contrary, what is clearly established law is that even if defendant's conduct was negligent, which we certainly don't think it was, negligence does not rise to the level of a substantive due process claim. I just wanted to make one other, I'm sorry, yes. Before going to prison, Mr. Brigham mentioned ongoing discovery. And this takes us back to Judge Parker's initial inquiries. What exactly is going on? How would you describe the status of this case? I would have thought that ordinarily claims of qualified immunity are designed to avoid Absolutely. discovery and related procedures in addition to trials. Absolutely. And this case was complicated by the fact that microgenic defendants are also in it. You had defendant Bedard, who is not on appeal here, but is still in the case. So discovery has has continued. And actually, the point I wanted to make in terms of a factual correction kind of relates to that, There's also discovery ongoing in our litigation against microgenics, which is a separate lawsuit. And one of the issues that's being litigated there is this question of indemnification. We certainly think we should be indemnified if there's any liability against us, which there shouldn't be. But that issue hasn't actually been decided. So certainly it's not correct to say that there's no chance that the state could have to pay money. It doesn't matter who's held liable here. Go back to Judge Parker's original inquiries. It seems to me that if we were to make a decision in your favor on qualified immunity, we would effectively be disrupting ongoing procedures. Is that right? Ongoing discovery procedures? I don't think so at all. I'm not sure if your Honor can elaborate. But basically, the whole point of qualified immunity, as I think your Honor is getting at, is an immunity from suit, not just an immunity from liability. But that ship has sailed. I mean, how many depositions have you all taken? I'm not sure of the answer to that. I'm sorry? I'm not sure of the answer to that. But what I can tell you is expert discovery is still ongoing. There's a whole lot more that we would be dragging. Has your client been deposed? I'm sorry? Has your client been deposed? I believe so. I don't know all the details because I'm not handling this at the trial level, but I can tell you, and maybe my colleagues could say more about it, but I believe we opposed my client being deposed. Wait. Are you telling us that you opposed your client being deposed, but you don't know whether your client has been deposed or not? I understand that my client was deposed. Do you have a copy of the immediate deposition? I have a copy of the deposition. I believe I glanced at it. What did you say? I honestly didn't read every piece of it because it's on a motion to dismiss, as my understanding is that, you know, you looked at the complaint alone. I think certainly nothing, as I understand it, from my colleagues who did handle this at the trial level, absolutely nothing suggests any additional liability. What my understanding of the discovery is, is that it confirms exactly what we've been saying all along, which is that this is, that Anoushi and O'Gorman and the state acted completely reasonably here, and the people who did not act reasonably were the ones misleading the state, which is microgenic. Well, let's take a little time if we've got to look at this deposition, see what he says. It may be clear now that you're right. Again. We don't know. You may or may not have read your client's deposition. We certainly haven't. Because, again, the whole point of qualified immunity is that the earliest possible point we get out of the case and we don't have to deal with this anymore. I don't think that's true at all. The discovery is ongoing. The earliest possible time was after the complaint had answered and then you moved to test the sufficiency of the complaint. That ship sailed. We don't know the schedule, but that ship was sailing sometime in the past. With respect, Your Honor, I don't agree with that in the sense that every day we're incurring more expense and more burden on the state because we're continuing to be dragged through expert discovery and, you know, there'll be some re-judgment briefing. And so now, as soon as we can get this decided... Is there some re-judgment briefing in this case? I assume there will be at some point. There isn't yet. I mean, it seems to me that judicial economy militates in favor of letting the discovery process go forward to be completed. I'm just wondering why are we... Why would we insinuate ourselves into a procedure that is already well underway? That is the very procedure that qualified immunity is designed to avoid. I mean, the very purpose of qualified immunity is to prevent us from having to go through discovery and various other... But you're doing that, as Judge Parker has just said. Well, the fact of the matter is if we had to wait until summary judgment, we'd be going through years more litigation, potentially more appeals before... We're not making any great moral judgments here. We're just trying to understand what is going on. And it strikes me that, as Judge Parker indicated, this should sail. You haven't waived or forfeited any right under the law, but on the other hand, you can engage in prolonged pretrial proceedings of some kind. Again, my colleagues can say more. My understanding is that we opposed this discovery happening before the completion of the appeal. That didn't work out, and so we had no choice. What we did is we pursued the appeal as quickly as we could, and here we are. And the complaint simply doesn't support the allegations. Help us to understand that. Why, if you had filed a notice of appeal immediately when you understood that the district court was going to permit discovery, that would have come to us right away. I mean, that's not an immediately appealable order. This qualified immunity order was, and that's why we appealed that. I mean, yeah, I'm not sure what else we could have done. Thank you, Your Honor. Thank you. Thank you. To answer the questions, the depositions are complete. Commissioner Annucci has testified. Everyone else has testified. That's done. It's simply a question of whether they go into summary judgment. Your Honor is correct. Freeman v. Rideout is a very important case because this court in Freeman v. Rideout sought to clarify the, quote, confusion between a constitutional right and the deprivation of that right without due process. And in this case, this court decided that given the egregious nature of the charges there, the corrections officers fabricated unfounded charges, clearly scienter, clearly what's not here. This court decided that was a procedural due process case because the incarcerated individual had a right to a hearing to be heard to contest the charges. So I guess, thank you, that is your response to the other side's response to Judge Cabranes' question to your opponent, which she will be responding by letter. I just wanted to point out, since you're on this topic of the Wiley v. Kirkpatrick and the Freeman v. Rideout case, which your opponent is going to respond to, I would suggest I chat briefly with Judge Cabranes and ask an objection from Judge Parker. We would say within seven days if counsel can submit a letter addressing those two cases. And you would respond? Yes, Your Honor, and we've briefed this in our brief. No, I know. But if we're asking your opponent, I want to be sure that you have the opportunity to respond as well. So I'm using this opportunity to tell you that, counsel. But I think on that point, Your Honor, the court is correct because to affirm this decision would be, in essence, to overrule Freeman v. Rideout, which, in essence, the whole point of that case was to clarify the confusion. So if discovery has been done, how do you respond to the question then that Judge Parker made, which is the ship sailed? At this point, your client can move for summary judgment if, in fact, discovery has shown that he is entitled to qualified immunity. Two points on that, Your Honor. One is this. With discovery, the plaintiffs now have full access to the information. We're years into this litigation. They have yet to produce a plaintiff that meets the procedural benchmarks of a procedural due process violation. So we're still in this category of arbitrary... They're not claiming procedural due process. They're claiming substantive due process. Yes, Your Honor. But they have produced no other plaintiff that meets the benchmarks of a procedural due process violation. Separately, Your Honor, the court below has characterized it as functionally arbitrary. That's an inventive way of defining substantive due process, and this court has been very clear about trying to control the expansion of substantive due process. Whether or not it's inventive, you can go back to the trial judge and say, not only was it inventive, and you shouldn't have allowed this claim to stand, now that discovery is done, it's very clear that my client's entitled to qualified adjudication. And to that, I go to governmental resources, court resources. Now, you know, the litigants have to file summary judgment motions. The court has to decide those summary judgment motions. That's very labor-intensive. That's what we get the big bucks for. And respectfully, Your Honor, the law says that you decide it at the earliest possible moment, and the complaint, all of our allegations here are based on the allegations and the complaint. We're not inventing facts. We're not bringing in facts from discovery. Were the... Have the plaintiffs been deposed? Is there any... Do any of the plaintiffs have been deposed? Yes, they have. What other discovery has anyone asked for? There is no further discovery required or asked for, right? To my knowledge, the depositions are complete, and, you know, there's no outstanding discovery. And we can assume this is a very unusual procedural setting. We're not suggesting that this is the way that we should handle these things in the future. But I take it from what all counselors said, the record is complete in terms of... A motion for summary judgment is possible. It is, Your Honor. But that would involve, you know, just many summary judgment motions for many docked defendants when the allegations in the complaint don't rise to the level of substantive due process. And to be quite... You know, with regard to your question, Judge Kahn, you know, what is the liberty interest and what is the case? And, you know, to affirm the decision below is to answer that question in a way that blurs the distinction between procedural due process and substantive due process, and that was what Freeman was about. And so it has precedential... So your concern is the precedential value that an affirmance would have on what becomes the substantive due process. Exactly, because if it's functionally arbitrary, any incarcerated individual can point... Maybe it's not a test. Maybe it's the bias of a police corrections officer and testify. Maybe it's the bias of a fellow... Yeah, but now, in this record, though, we will be able... We will be able to determine with, you know, as much certainty as you have in these matters what happened to Ms. Warwick and Mr. Schultz when they were, you know, moved to... punitive confinement. It doesn't approach... Maybe terrible, maybe conscious shocking, but it's squarely within the kind of deprivation that Freeman and Wiley said don't amount to a substantive due process. And that is what Freeman and Breidau said, that it's not a substantive due process violation per se. It's not a constitutional violation per se because there was due process. The concern here, Your Honor, is this. Apart from, you know, whatever efforts are required by attorneys to brief this, this court, in affirming the decision below, will further blur the distinction between procedural due process and substantive due process. And I respect that, Your Honor, but a key component in this is that the plaintiffs are very sympathetic. Are what? The plaintiffs are very sympathetic. They endured, you know, hardship that they shouldn't endure, but that hardship did not rise to the constitutional level of a procedural due process violation, and to somehow move this into substantive due process expands that. You're concerned about an inappropriate precedent going forward.  And we certainly share that. Thank you, Your Honor. We understand that concern. Thank you, counsel. Thank you very much. And Attorney Meehan? Thank you. Just two points I would like to raise. Initially, Mr. Brinkerhoff submitted that parole used separate confirmatory testing when it came to parolees and drug test results. I would submit that the Division of Parole was a separate state agency until approximately 2010 when it was merged with the New York State Department of Correctional Services to become DOCS, Department of Corrections and Community Supervision. The fact that they may have had a different test and they recognized confirmatory testing was after the fact, after DOCS already had its history and had its procedures concerning its drug testing and using the same test twice and treating the second test as a confirmatory test. The other point is I'd like to address one of the, I guess, benefits of being a sole practitioner is that I was involved in all the depositions and discovery in this case. And qualified immunity, the benefit of that, the primary benefit, is to dismiss claims that don't fail to state a claim or based upon qualified immunity at the earliest opportunity to get the defendants out of the case so they don't have to continue with litigation. In this case, we've had approximately 35 depositions of parties and fact witnesses. We have right now ongoing expert discovery. Reports have been exchanged and now we're trying to schedule depositions for the experts. On top of that, if we were to pursue summary judgment, if our appeal is not granted, there are hundreds of thousands of pages of discovery documents produced in this case as well as all the deposition transcripts and everything that would go into a summary judgment motion. And that would impose significant costs upon the state, time involving the parties, everything, you know, which would support consideration of qualified immunity on a motion to dismiss based upon the allegations in the complaint. You would have to wait till the close of discovery to move for summary judgment? So even though the expert testimony may or may not impact the summary judgment motion for your client, you would nonetheless have to wait? I think that would be the best practice, Your Honor, is to wait until all discovery is concluded and then make the motion because I don't believe we would get a second chance perhaps to make summary judgment. So we would want to wait. I think it's the best practice until all discovery is completed including expert discovery. Thank you, Your Honor. Thank you. Thank you all. That was a very interesting case. Thank you. A very well-argued counsel for both sides. Thank you.